1

1       UNITED STATES DISTRICT COURT
        EASTERN DISTRICT OF NEW YORK
2
--------------------------------X
3                                :
UNITED STATES OF AMERICA,        :   CR-03-372
4                                :
        v.                       :   U.S. Courthouse
5                                :   Brooklyn, New York
SAID ABEOLELA,                   :
6                                :
        Defendant.               :   TRANSCRIPT OF SENTENCE
7                                :   August 4, 2005
--------------------------------X   2:00 p.m.
8

9   BEFORE:

10          HONORABLE JOHN GLEESON, U.S.D.J.

11

12  APPEARANCES:

13  For the Government:          ROSLYNN R. MAUSKOPF,
                                 United States Attorney
14                               One Pierrepont Plaza
                                 Brooklyn, New York 11201
15                          BY:  JACK SMITH,
                                 ROGER BURLINGAME,
16                               Assistant U.S. Attorneys

17
    For the Defendant:          STEVE ZISSOU, ESQ.
18

19

20

21  Court Reporter:              Mickey Brymer, RPR
                                 Official Court Reporter
22                               United States District Court
                                 225 Cadman Plaza East
23                               Brooklyn, New York  11201
                                 (718) 260-2439
24

25          Proceedings recorded by mechanical stenography.
         Transcript produced by Computer-Assisted Transcription.

2

1        THE CLERK:  United States versus Said Abeolela,

2   docket number CR-03-372.

3        (Interpreter sworn.)

4        THE CLERK:  Parties state appearances for the

5   record.

6        MR. SMITH:  Jack Smith and Roger Burlingame for the

7   United States.  Good afternoon, Judge.

8        MR. ZISSOU:  Steve Zissou, representing Said

9   Abeolela.  Good to see you, Judge.

10       THE COURT:  Good to see you.  How are you?  Hello,

11   Mr. Abeolela.

12       DEFT. ABEOLELA:  Hello, sir.

13       MS. HASNICK:  Sindee Haasnoot from Probation.  Good

14   afternoon as well.

15       THE COURT:  Nice to see you as well.  Did you swear

16   the interpreter?

17       THE CLERK:  Yes.

18       THE COURT:  Ready to proceed to sentence?

19       MR. ZISSOU:  We are, Judge.

20       THE COURT:  You read the presentence report?

21       MR. ZISSOU:  We have.

22       THE COURT:  Any objections?

23       DEFT. ABEOLELA:  Yes.

24       MR. ZISSOU:  There are no objections.  There is just

25   a -- it doesn't require a hearing, or anything, but there was

3

1    an allegation on -- it is on page five, part of a victim

2    impact letter and I have conferred with the various parties

3    and I do not believe there's any substance to the claim that

4    Mr. Abeolela acted as described in paragraph -- page six,

5    actually, third paragraph from the top.  We're not asking for

6    a hearing or anything, but from my investigation of that it

7    never happened.

8           MR. SMITH:  Judge, I can state that our investigation

9    reveals allegations of that sort were made and proved not to

10   be true.  In fact, the person who made them protracted them.

11          THE COURT:  This is just the statement of her --

12          MR. SMITH:  She references the statement by the

13   defendant's wife, claiming he abused her and her children.

14          MR. ZISSOU:  It is just the kind of thing you want to

15   point out.  Other than that there are no objections.

16          THE COURT:  Just so it is clear, this is accurate,

17   but this is Ms. Parso's statements.  I take it from both of

18   you that you both challenge the correctness of that piece of

19   it, right?

20          MR. SMITH:  That's correct, Judge.

21          MR. ZISSOU:  Right.

22          THE COURT:  I will not tinker with the report, it

23   accurately describes her statement, but I will take what you

24   say into consideration.

25          Have you read this report as well?

1          DEFT. ABEOLELA:  Yes, sir.

2          THE COURT:  Does that resolution of your beef with

3    the report meet your needs?

4          MR. ZISSOU:  It does.

5          THE COURT:  Would you like to be heard with regard to

6    sentence?

7          MR. ZISSOU:  Judge, I know you have my letter, the

8    support letters that I've given.  I know that you also

9    presided over the trial of the codefendant, so you sat just a

10   few feet from Mr. Abeolela and heard his testimony and had an

11   opportunity to determine or gauge his truthfulness, the kind

12   of person he was and the circumstances under which he got into

13   this case.

14          I think everyone is in agreement that Mr. Abeolela

15   certainly never intended the results, the terrible result that

16   occurred in the case.  And while he has accepted

17   responsibility on many different levels for his role in this

18   case, and I say again, I indicate I know that you've heard his

19   testimony, he clearly did not want to see this man die.

20          THE COURT:  Why shouldn't I believe that those are

21   the natural and probable consequences of his actions in

22   retaining Khalil to recover this debt?

23          MR. ZISSOU:  Well, I think that, putting aside the

24   elements of the offense and that kind of thing, just morally,

25   I suppose, I don't think he knew, quite frankly, that Khalil

1  was the kind of person that we all learned during our own

2  independent investigation of the case and that the

3  government's proof at the trial showed, I don't think he could

4  have known the extent of this man's aberrant mind, if you

5  will, his psychotic or murderous --

6       THE COURT:  Let me interrupt briefly.  Forgive me.

7  In fairness to you, I should share this with you.  I said on

8  another occasion, when Khalil was sentenced, and this is my

9  sense, that there was a -- my belief that this defendant

10 minimized when he testified to his participation in the

11 following respect:  He claimed, when he testified at trial,

12 not merely what you're asserting now, but he claimed there

13 came a point before the victim was kidnapped that he tried to

14 call it off.

15      MR. ZISSOU:  Right.

16      THE COURT:  I don't have a crystal ball, it is not

17 like there's some meter that you can tell whether someone is

18 telling the truth or not.  I didn't believe it.

19      MR. ZISSOU:  Well, I don't --

20      THE COURT:  I just say it only because I ought to

21 tell you, you're his lawyer, in fairness to you I ought to say

22 that to you.  If you want to address it, you can.  I

23 interrupted you.

24      MR. ZISSOU:  I did pay attention to Khalil's

25 sentencing.  I was aware of some of your Honor's remarks and,

                              M. BRYMER, RPR, OCR

6

1  frankly, to me it is not about whether he said it to Khalil or

2  not.  It is what actions he took in support of that and this

3  is something that I think he himself has come to understand.

4  It is not about saying do it or not do it, it is about the

5  action you take afterwards and, clearly, as he knows, indeed,

6  he said it to me just yesterday, he acted like a coward.  Not

7  my word, his.  He said I could have done more and had I done

8  more he would be alive today.  Instead, I acted like a

9  coward.

10          Now, I say that not to embarrass him or belittle him,

11  but -- and with full knowledge of the fact that by that time,

12  by the time Mr. El Sayed was abducted and killed it became

13  much clearer who Khalil really was, because now the threats

14  were real, killing your wife and family, doing all sorts of

15  things to him, and the constant threats to Mr. Abeolela

16  resulted in his, frankly, not doing enough, so I guess the way

17  I interpret your gut reaction is -- and the way I've said it

18  to him, so what, so you said not to do it, what else did you

19  do?  What did you do next?  Did you take any action?  Did you

20  go to the police?  Did you try to do anything?  And he

21  didn't.  So, to me, whether he told the guy do it or not,

22  whether he told the guy let's not do it, whether he meant it

23  seriously or not, it is such a non factor in this case, to me,

24  which is why in my letter I made it a little bit different.

25          It is not about what he did -- clearly it is in part

M. BRYMER, RPR, OCR

7

1   about that, but what it is and what this case is about is what

2   he eventually did and what he -- and the fear and the concern

3   he had that he was able to overcome and it took awhile.   And

4   the interesting part of it is there's another part of how this

5   whole thing came together that I think some folks found a

6   little hard to believe and that's how he eventually started to

7   cooperate and that is -- I put it in my letter, but it

8   sounds --

9            THE COURT:   What was the information?

10           MR. ZISSOU:   We found and we were -- obviously, we

11   knew the motive here was the death knell of any defense we

12   could put forward in the case, so we were actively pursuing

13   any other lead or connection to Mr. Khalil and Mr. El Sayed

14   and that day, I think it was a day or two I went to see him,

15   we actually found a witness who said that he had heard about

16   some conflict that Mr. El Sayed had with -- with the deceased

17   -- I'm sorry, that Mr. El Sayed had with Mr. Khalil, and I

18   was ecstatic, because I thought this was -- we understood the

19   case against Mr. Abeolela was largely phone records and the

20   motive and we understood it to be a weak case.

21           So, I was quite naturally ecstatic, and when I went

22   to see him I was equally ecstatic, "I have great news for

23   you," pat him on the back, "we're getting someplace."

24           THE COURT:   Sounds like he's better versed in the

25   hearsay rule than you are.

M. BRYMER, RPR, OCR

1          MR. ZISSOU:  We thought we would follow it up.  We

2    would find a witness, bring somebody in to at least establish

3    an alternative motive here.

4          THE COURT:  I understand.

5          MR. ZISSOU:  As I'm saying it to him, his eyes were

6    darkening and he looked worse than I'd ever seen him.  He

7    looked physically like he was going to get sick and he looked

8    at me with that -- with those eyes and said I haven't been

9    truthful with you, I haven't told you everything and for the

10   next hour it all poured out and I was equally stunned.  Not

11   only because of my own naivete, obviously, I have been doing

12   this for awhile and I have been on both sides and, you know,

13   I'll be 50 in September and I tend not to be naive anymore,

14   but I guess I still get a little -- I tend to believe things

15   sometimes and I was, frankly, mesmerized by the story and by

16   what he was explaining and the detail to it and the level of

17   threats and the concern that he had for his wife and his

18   family, and, of course, we immediately contacted Mr. Smith and

19   shortly thereafter we -- he started to cooperate.  He came in

20   right away.

21          His first concerns were obviously how are you going

22   to protect my family and that remains his concern, protection

23   of his family, because, as your Honor knows, there's still

24   folks out there who are part of this abduction who

25   participated with Khalil in the murder and who obviously the

                                        M. BRYMER, RPR, OCR

1   government continues to investigate, but obviously I'm not

2   privy to what efforts or where they are with that or what it

3   is going to take, but that's really what it is.

4          So, going back to the original, you know, query,

5   frankly, it is not what he said or did, it is the actions

6   afterwards.

7          Eventually the man remembered why he came to this

8   country.  Eventually the man remembered who he was,

9   eventually.  This is the man who remembered the hard work and

10  devotion and the efforts he made in his adopted country and he

11  stood up, came to court and he pointed to the man who the

12  government had been long investigating and making every effort

13  to punish and convict for this particular offense.

14         So, I'm happy that he -- I'm happy he was able to

15  help the government.  Again, I don't know what your view of

16  the quality of the case was, but I read his testimony and

17  obviously I was aware of the case they had here.  To me he was

18  the most important witness they called.  To me, without him I

19  don't know how they would get a conviction.  Sure, they might

20  be able to.  As you know, it is a formidable team led by a

21  formidable United States Attorney and I don't doubt that they

22  would have put on a great case, but without him linking

23  Khalil, making the connection, I don't think there is a

24  conviction in this case.

25         Mr. Smith himself described him as, I think, either

1  the principal witness or the most important witness, whatever

2  phrase he used during the trial.  He was.  Has no prior

3  record.  Has three young children, a wife.  His wife is in

4  court.  Children are off with a baby-sitter, of course.

5       I guess that's it, Judge.  He's prepared now for

6  whatever your Honor has in mind.

7       THE COURT:  Is there any arrangement between Egypt

8  and the United States about transferring prisoners back that

9  you are aware of?

10       MR. SMITH:  In terms of him doing time in Egypt?

11       THE COURT:  Yes.  Some countries have treaties to

12  which people can apply to finish their time at home.

13       MR. SMITH:  I don't know with Egypt, Judge.  I tend

14  to doubt it, based on the countries I know we do and don't

15  have relationships with.  I can tell the Court we've discussed

16  from the beginning Mr. Abeolela's family situation, it has

17  been the foremost discussion we have as much as talking about

18  the facts of the case.

19       We met last week and Mr. Abeolela feels his family,

20  given the fact there are still members of Khalil's group

21  standing here, he feels his family would be safer there and

22  his wife and children are going to leave for Egypt shortly and

23  Mr. Abeolela as a result of this case is going to be deported

24  back to Egypt after he serves his sentence.

25       MR. ZISSOU:  My understanding, Judge, is Egypt is not

M. BRYMER, RPR, OCR

1  a party to the treaty transfer agreements that the United

2  States had.  I'm not 100 percent sure.

3           THE COURT:  All right.  You have a right to speak

4  before sentence is imposed.  Is there anything you want to

5  say?

6           DEFT. ABEOLELA:  Yeah.  I have something that I

7  wrote.

8           MR. ZISSOU:  He will try to read it in English,

9  Judge.

10          DEFT. ABEOLELA:  His Honor, first and foremost I

11  would like to apologize to the Court and the people of the

12  United States of America.  I have been living in the United

13  States for more than 20 years.  I come to this country with

14  intention of finding a job, starting a family and to have a

15  good healthy kids.  The first day come to America I was able

16  to obtain a job.  All these years I have always been gainfully

17  employed and thanks to the grace of God I was able to meet a

18  beautiful woman, marry and have three beautiful children.

19  With her my family means very much to me.  Everything.  I love

20  them dearly.  I never wanted Magdy or anyone's wife and child

21  to husbandless or fatherless.  Every night and day, every

22  moment I feel great remorse for my part in that action.  I can

23  never forgive myself.

24          My conscience is overwhelmed.  I feel extremely

25  guilty and sorrow.  I have to live with this for the rest of

                                        M. BRYMER, RPR, OCR

1 my life because I know I never spoke to -- if I never spoke to

2 Mohammad about my problem that none of this would happen, or,

3 if I called the police, maybe I could save him and Chad would

4 still have a father.  The guilt that I feel will never be

5 wiped away.  It will always be there for the rest of my life.

6        And thank God I was able to assist the agent in every

7 possible way that I could.  It does not take away the feeling

8 of some relief because I know at the end I was able to assist

9 the government.  Also, I would like to thank Mr. Jack Smith

10 and Mr. Krinko (ph.).  They showed me the utmost respect

11 considering the circumstances, so to them I say thank you for

12 their assistance.

13        And I like to give a message to Baro.  I know that

14 you have a great disdain for me at that point and I will feel

15 sorry for the rest of my life knowing that I caused a lot of

16 pain to Chad and you.  For this I can never forgive myself.

17 And I want to apologize to my wife and to my kids and I don't

18 think I deserve any mercy for all the pain I caused for his

19 family and for my family.

20        Thank you.

21        THE COURT:  Thank you.  Mr. Smith.

22        MR. SMITH:  Judge, I would just like to add a few

23 things to the letter the government submitted to the Court.

24 The first is regarding the circumstances and the timing of

25 Mr. Abeolela's cooperation.  It was clear to me when we first

M. BRYMER, RPR, OCR

1 met with Mr. Abeolela, not even knowing the story of his
2 discussions with his attorney, that he was very fearful of
3 Mr. Khalil and his associates.  I can tell the Court that in
4 our first meetings the majority of the time was talking about
5 his safety rather than talking about the case and again I
6 don't have a crystal ball either, but it appeared heartfelt
7 and it was legitimately a very frightened man.

8         Whatever sentence the Court comes to, I don't think
9 Mr. Abeolela should be penalized for when he came in to
10 cooperate rather than, for example, when he was first arrested
11 because there was no threats.  Mr. Khalil threatened people.
12 He had associates who would harm people and kill people and I
13 think the fear that he felt was legitimate.

14         Mr. Abeolela met with us repeatedly both before his
15 cooperation agreement because we interviewed himself times
16 before offering the agreement and several times in preparation
17 of trial.  In that time Mr. Abeolela was forthright, was easy
18 to deal with and was truthful.  At trial, he was, as Mr.
19 Zissou stated, as I stated in my letter, a central witness in
20 the case.  He was the only coconspirator available to the
21 government who could tell the inside story of the case.   I
22 discussed with Mr. Zissou about whether we would have secured
23 a conviction without Mr. Abeolela, but certainly his testimony
24 made it a lot easier and tied together the various pieces of
25 documentary and physical evidence and eyewitness testimony

M. BRYMER, RPR, OCR

1    that we had.

2         More than that, your Honor, I think it is relevant,

3    as everyone can agree, that the government's case against

4    Mr. Abeolela was by all accounts weaker than the one against

5    Mr. Khalil, and I think everybody knew that going in and

6    that's another factor to consider.

7         So, that's all I have unless the Court has any other

8    questions.

9         MR. ZISSOU:  May I have a moment, Judge?

10        THE COURT:  Yes.

11        MR. ZISSOU:  Thank you.

12        (Mr. Zissou and defendant confer.)

13        MR. SMITH:  I'm sorry, Judge.  Ms. Parso would like

14    to address the Court today.

15        THE COURT:  She may.

16        Good afternoon.

17        MS. PARSO:  Good afternoon.  I'm sorry, I am so

18    nervous.

19        THE COURT:  It is okay.

20        MS. PARSO:  I'm doing it again.  I'm sorry, so

21    sorry.

22        THE COURT:  Just try to keep your voice up and speak

23    slow so the court reporter can take it down.

24        MS. PARSO:  I'm sorry, sorry, I can't help it.

25        THE COURT:  No need for you to apologize.

                                        M. BRYMER, RPR, OCR

1          MS. PARSO:  Your Honor, this man has known my son

2    from birth.  He came to the hospital to visit me when I had my

3    child.  After he got rid of my husband he became my friend.

4    That's why it hurt me so much.  I trusted him.  He came to my

5    house.  Never for a minute before they pick him up, never for

6    a minute did I ever believe that he was capable of something

7    like that.

8          A few times Mr. Smith called me and they were talking

9    to me.  They asked me a few questions.  Who helped you, you

10   know, get rid of your store?  Said Abeolela helped me with

11   some ideas about how to do the posters and whatever, the sales

12   stuff.  And I felt because in the beginning they had asked him

13   -- like a few days after Magdy died they asked him some

14   questions and they had him all day at the precinct and I was

15   upset about that.  I was so upset about that because I said

16   they have the wrong guy, why are they questioning him?  This

17   is a good man, he is my friend.  I told him, I said, my God,

18   you're a good man, why do they think you're capable of that?

19   I was so upset and when they asked me, Mr. Smith asked me --

20   I'm sorry, I'm not reading from the papers because I have

21   everything in my memory -- he said who helped you?  I said my

22   manager.  I failed to mention his name.  Why did I fail to

23   mention his name?  Because I felt they were after the wrong

24   guy.  I didn't believe, I didn't believe he's capable of

25   this.

                                          M. BRYMER, RPR, OCR

1       When they arrested him I knew that they had to have

2   enough evidence and I understood what was going on there.

3   After Magdy died he became my friend, he would give me rides

4   because I didn't drive at that time and we would chat in the

5   car and everything he said was the store is not going good, I

6   can help you, I can be your partner, but you have to trust me

7   and we'll -- we'll do inventory and I'll -- I'll give amount

8   of whatever, you know, half of it and you trust me and I'll

9   bring the store back.  I had no intention of keeping that

10  store.  I had no intention, so I said no, I'm not interested.

11  Now I know why, now I understand he asked me that question.

12  Now I understood, because he wants to get access to the

13  business and probably steal from me.  I'm sorry to say that

14  but that's in my mind.

15      As far as I'm concerned, after I listened in court to

16  testimony and even after Magdy died he never had a good word

17  to say about him.  I would listen to him.  I feel so guilty

18  about that.  I would listen to him saying bad things about my

19  husband. I have to live with that, because today I feel guilt

20  and I -- one day I couldn't take it anymore and I said Said,

21  you forgot the good times.  Did I feel Magdy owed him money?

22  Maybe, I don't know.  It wasn't my fault.  Don't tell me about

23  it.  I was very upset and I felt like I had to sit there and

24  listen to him and one day I said what about the good times,

25  didn't he nurse you back to health, didn't he take your family

1   and bring them to my home when they were sick?  Didn't he help

2   you then?  He never showed any remorse.  He would say bad

3   things about my husband.  I had to listen to that because I

4   would say I need him to give me rides.  I don't know.

5          Your Honor, what kind of a man, after what he did

6   came to my house and had dinner with me and my son and his

7   family.  He came to my son's birthday party, bought presents

8   for my son.  He came to my sister's wedding.  I even get a

9   message with his wife can you come to my hearing, I'm

10  innocent.  I didn't believe that.  I wasn't going to come.

11         Your Honor, what kind of a man says to his wife if

12  you don't shut up I will drop this baby?  She told me that.  I

13  believe her.  I'm her friend.  I still am today.  I am always

14  listening to her on the phone.  I'm here to support her,

15  because she is a victim such as I am.  What kind of a man does

16  those things?  His kid and my kid cannot play together.  They

17  occasionally would get together and come to my house.  My son

18  always asks, Ma, when am I going to play with Amear (ph.) and

19  Jesrena (ph.)?  I said they moved because I have no intention

20  of getting the kids back together because his wife confessed

21  to his kids what he did.  But save my son the pain, I haven't

22  done that.  Because when I had to tell the truth to my son

23  last summer, I told him, Chad, some bad guys killed your dad.

24  He didn't have an accident, I lied to you.  I told him some

25  bad guys killed your dad.  I didn't say Said Abeolela, because

M. BRYMER, RPR, OCR

1    at the time I didn't know that.

2         In my opinion Said Abeolela is a cruel and violent

3    man.  He cannot control himself.  Your Honor, he confessed to

4    me once that he beat his brother so badly he had to be

5    hospitalized.  He told me that with his own mouth and not only

6    me did he say that to, other people.

7         I know that one day he will be free and he will live

8    a normal life and he will be able to hold his kids and kiss

9    them and visitation.  What about my little boy?  Never be able

10   to hold his dad again.  In my opinion he is responsible as

11   much as Khalil is, because can I give you an example?  I just

12   want to give me opinion.  I'm sorry, if I'm out of line, but

13   America, we went to look for Osama Bin Laden because of the

14   World Trade Center bombing.  He was the mastermind behind

15   this.  We went to look for him.  He's the mastermind behind

16   this.  No one else.

17        THE COURT:  I know you're upset.  Collect your

18   thoughts and take another 30 seconds and wrap it up.  Okay.

19        MS. PARSO:  A little piece more to say.

20        THE COURT:  A little piece more, go right ahead.

21        MS. PARSO:  Thank you very much.

22        THE COURT:  Just take a half a minute, a minute.

23        MS. PARSO:  Okay.  I'm fine.  Thank you so much.

24   Your Honor, there are four kids involved.  Three of his and

25   one of mine.  I would like to ask the question did he think

M. BRYMER, RPR, OCR

1  about them?  I mean, he said he changed his mind because his

2  store was doing well and he didn't want to go through it

3  anymore.  It would make me feel a little better if he had said

4  I changed my mind because I have three kids.  That would have

5  made me feel a little better.  But it is clear to see he was

6  lying.  He didn't change his mind.  We all know he didn't

7  change his mind.  I don't want to get into that, but I know he

8  didn't change his mind and I know everybody here know he

9  didn't change his mind.

10       One last thing.  I can't feel sorry for him. I'm so

11 sorry, I wish I could, but I'm speaking on behalf of my son,

12 so I cannot say anything.  All my opinion is he's greedy and

13 selfish and he didn't change his mind.  He could have but he

14 didn't.  Today he would have been a hero to me and my child

15 and his children if he had only just called me, called the

16 store and said something bad is happening, I'm sorry, I

17 planned something, but he didn't.  He didn't want to stop it.

18 I'm sorry, he didn't.

19       THE COURT:  All right.  Thank you.

20       MS. PARSO:  So sorry.  Thank you so much.

21       THE COURT:  Thank you, Ms. Parso.

22       Anything further from the defendant?

23       MR. ZISSOU:  I really do not want to be in a position

24 to --

25       THE COURT:  I don't think you should.  I think what

M. BRYMER, RPR, OCR

1   we'll take is a very brief two minute recess.  Please don't

2   take the defendant back before sentence is imposed.

3            MR. ZISSOU:  Very well.  Thank you, Judge.

4            (Recess taken.)

5            THE COURT:  Okay.

6            MR. ZISSOU:  Judge, I forgot to point out there are

7   numerous of Mr. Abeolela's friends and family in the

8   courtroom.  Many of whom have written letters and I neglected

9   to point that out.

10           THE COURT:  All right.  Thank you for pointing it

11  out.  I read all the letters.  They say something good about

12  you and there's plenty of good about you, Mr. Abeolela, but

13  for this horrific episode in your life.  I know more about

14  this case than I normally know because very few cases are

15  preceded by trials in which the facts are laid bare before the

16  sentencing judge.  In this case, it wasn't your trial, it was

17  Khalil's, but it had the same effect.

18           My job, both before Booker and after Booker is pretty

19  similar here in that there's a 5K1.1 motion and a 3553(e)

20  motion which empowers me to impose a sentence anywhere from

21  probation to life imprisonment.  The guidelines we haven't

22  really touched upon.  There's a range here that isn't

23  challenged.  I'll consider it to be the advisory range.  For

24  what it is worth, I will say that according the defendant a

25  minimal role, which is uncontested here, is -- viewing the

M. BRYMER, RPR, OCR

1   facts in the light more favorable to him than I think he may

2   deserve.  And this implicates the observation I made earlier

3   to you, Mr. Zissou, which I think has some significance that

4   you've done your best to blunt, but you haven't allayed my

5   concerns entirely.  That is the concern I have because

6   although I thought you testified in the main truthfully, I

7   thought you provided critical testimony against Khalil,

8   without which I really don't know how even these able

9   prosecutors might have prevailed, there was some

10  circumstantial evidence on which they indicted the case, but

11  your testimony really was critical, in the main it was

12  truthful, but I don't think you testified truthfully about

13  your efforts to keep this kidnapping from occurring.  I didn't

14  believe you.

15          It has some significance in two respects.  One is if

16  you envision the spectrum that includes on one part of it

17  coward in this affair and the other predator, it pushes you

18  farther along to the predator side of that spectrum.  You're

19  no Khalil, that's for sure.  There's no question who the most

20  culpable person in this horrific, grotesque murder was, but I

21  believe that you distance yourself in an untruthful way from

22  the true facts about how you got this monster implicated in

23  collecting your debt and that has significance both in

24  characterizing your role in the offense and not for nothing,

25  as we say here in Brooklyn, perjury matters, and in

M. BRYMER, RPR, OCR

1    determining the degree of benefit to which a cooperating

2    witness is to be accorded for cooperation it ought to be

3    diminished to reflect perjury.  In the main I thought the

4    testimony was truthful.  It was only in the respect I've

5    identified that I thought otherwise.

6          You gave very valuable testimony against a very

7    dangerous man.  It was a horrible crime.  I'll confess and it

8    is very difficult to find benchmarks in this sort of

9    discretion laden area of sentencing, I'll confess to finding

10   some assistance in knowing what people who get convicted for

11   this type of murder get in state court.  I think if you went

12   to trial in state court you would get 25 to life on this

13   murder.  I think if you pled guilty in state court on this mix

14   of facts you would probably get a 15 year to life deal.  Here

15   you pled guilty -- 15 to life sentence rather.  Here you pled

16   guilty, you testified usefully, albeit not entirely

17   truthfully.  I've considered other factors that I'm obliged to

18   consider under 3553(a) - the fact that you have a family that

19   will need you when you get deported back to Egypt, the

20   terrible consequences of this woman who spoke before the break

21   and her son and it strikes me as appropriate to sentence you

22   to nine years in the custody of the Attorney General to be

23   followed by a five-year term of supervised release.  A special

24   condition of which you may not possess a firearm.  If you're

25   deported, you may not reenter the United States illegally.

M. BRYMER, RPR, OCR

1  There is a $100 special assessment, but no fine.  Yes?'

2         MR. ZISSOU:  Do you think I might be heard on two

3  things?  One is designation to the Northeast region.

4         THE COURT:  Granted.

5         MR. ZISSOU:  Second thing is I can't help but think

6  that a nine year sentence under the circumstances here is

7  probably -- I think -- look, you're the Judge, but I think

8  that's exceedingly high under the circumstances given what his

9  role is and I also think that -- I think it is very difficult

10  for your Honor to say that certain parts of his testimony were

11  not truthful, when agents for the government investigated this

12  case for years, thoroughly debriefed him, checked out various

13  parts of his story, are aware of aspects of the investigation

14  that your Honor may not be aware of and I think that -- I

15  think that it is probably -- I think it is a mistake to say

16  that because he told Khalil not to do it and you're not

17  convinced that he said that, I think that that is a -- if --

18  if that's the basis upon which your Honor is sentencing him to

19  such a lengthy sentence, given his role in the offense, his

20  cooperation with the government, his prior record, I mean I

21  think that's, frankly, I think it is an enormously long

22  sentence under the circumstances.  One-half the minimum

23  guideline range is less than that and that's, you know, kind

24  of the benchmark for cooperators who don't testify and I think

25  that to sentence somebody above that range really minimizes

                              M. BRYMER, RPR, OCR

1  the role that he played in terms of helping the government in

2  this case.

3      The government was trying to get him to cooperate in

4  this case for a very long time and essentially he was able to

5  overcome his fear.  They understood the important role that

6  his assistance would play in their prosecution of not simply

7  the fellow who committed the primary acts but a fellow who

8  pretended to be an FBI agent who at one point cooperated, who

9  obviously had turned a relationship he had with the government

10  -- we've not spoken about that yet -- a relationship he had

11  with the government and turned that into a sword he used to

12  extort people, to victimize people.  That's one of the reasons

13  why they were so hot, if you will, to get him convicted for

14  this particular offense.

15      Mr. Abeolela, and I'm reluctant to call him a victim,

16  because I think, you know, he's -- it is inconsistent in my

17  view for somebody who accepted responsibility.  In large

18  respects for lack of a better word, he was Khalil's victim.

19  He met Khalil.  He was told I can take care of this for you.

20  But very much he was a victim of a guy who was going around

21  with a license given to him -- not given to him, but the

22  license that he -- that he obtained and the experience he

23  obtained by working with the FBI.  And, so, on a certain level

24  he is a victim of Mr. Khalil.  The fear that possessed him and

25  prevented him, paralyzed him, if you will, can't be diminished

M. BRYMER, RPR, OCR

1  and it certainly plays a greater role, I think, than any

2  possible minimization.

3          Lots of folks try to minimize.  Lots of folks in

4  order to live with themselves and look themselves in the

5  mirror try to make it like I didn't mean this and I didn't

6  mean that, but that -- you know, this a good, decent guy who

7  did a lot of good things in his life, good father, good

8  husband, hard worker.  For him to look at himself every day in

9  the mirror, there has to be some, you know, way to live with

10  yourself.  You can't just, you know, immediately accept that

11  you're the worst thing in the world and you should go to jail

12  forever and think in the scheme of things the fear and the

13  victimization by Khalil, it plays a much greater role in how

14  he came to be in the position that he's in.

15          And again if that's what your Honor -- if that's what

16  your Honor is concluding, that there was intentional perjury,

17  I disagree.  I read the transcript, I've spoken to him for

18  hours and hours and hours.  His story has been consistent

19  since he told me the first time.  I really do think that it --

20  I really do think that you're not giving him enough credit for

21  what he has done.

22          THE COURT:  Thank you, Mr. Zissou.

23          Counts Two through Five remain open.  Government

24  moves to dismiss them?

25          MR. SMITH:  Yes, Judge.

                                        M. BRYMER, RPR, OCR

1        THE COURT:  Granted.  Is there a right to appeal?

2        MR. SMITH:  There is, Judge.

3        THE COURT:  You have a right to appeal the sentence

4   I've just imposed.  If you want to do that, you have to file a

5   notice within ten days in this courthouse or you lose your

6   right to appeal.  If you can't afford a lawyer to represent

7   you, one will be appointed for you, just as Mr. Zissou was

8   appointed for you here in this court.

9        Do you understand that, sir?

10       DEFT. ABEOLELA:  Yes, sir.

11       THE COURT:  Is there anything I haven't addressed

12  that I should have addressed?

13       MR. SMITH:  No, Judge.  Have a good day.

14       THE COURT:  As close as possible to New York, is that

15  what you requested?

16       MR. ZISSOU:  Northeast region.

17       THE COURT:  Northeast region.  Thank you, Mr. Zissou.

18       (Proceedings concluded.)

19

20

21

22

23

24

25

                                        M. BRYMER, RPR, OCR

1

1    I hereby certify this transcript is a true and
accurate transcription from my stenographic notes.

2

3

4

5    Mickey Brymer
     Official Court Reporter

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

M. BRYMER, RPR, OCR